UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 23-CR-20464-BLOOM/TORRES

UNITED STATES OF AMERICA

vs.

VICTOR MANUEL ROCHA,

        **Defendant.**
_____/

## FACTUAL PROFFER

The United States of America and Victor Manuel Rocha (the "Defendant"), personally and through his attorney, agree that the following statements are true and accurate and serve as the factual basis for the Defendant to enter a plea of guilty, as to Counts 1 and 2 of the Indictment, and could have been proven beyond a reasonable doubt, satisfying any of the elements of the charges in these counts, if this case went to trial:

Starting in or around 1973, the Defendant secretly supported the Republic of Cuba and its clandestine intelligence-gathering mission against the United States by serving as a covert agent of Cuba's intelligence services, including the Directorate of Intelligence, also known as the General Directorate of Intelligence (collectively, "DGI"). The DGI is charged with gathering worldwide intelligence information of interest to Cuba and its allies.

To further that role, the Defendant obtained and maintained employment in the United States government in positions that provided him: (1) access to nonpublic information, including classified information; and (2) the ability to affect the United States' foreign policy. After his employment ended, the Defendant held other positions and engaged in other acts intended to support Cuba's intelligence services. To do so, the Defendant always kept his status as a Cuban

agent secret to protect himself and others and to allow himself the opportunity to engage in additional clandestine activity. For example, the Defendant: (1) provided false and misleading information to the United States government to maintain his secret mission; and (2) met with Cuban intelligence operatives. The Defendant's activities, and his deceit, betrayed his oath of office and obstructed the lawful functions of the United States government.

At no time did the Defendant provide notification to the United States Attorney General or the Secretary of State, as required by law, that he was, in fact, acting as an agent of a foreign government, specifically the Republic of Cuba.

### The Defendant's Positions at the Department of State

From November 1981 until August 2002, the Defendant was employed by the United States Department of State, a department of the United States government that manages the United States' relationships with foreign governments and implements U.S. foreign policy. Throughout the Defendant's employment with the Department of State, the Defendant was employed in positions that gave him access to nonpublic information, including sensitive and classified information. Specifically, the Defendant held the following Department of State positions:

a. From in or around November 1981 until in or around December 1982, the Defendant served as an International Relations Officer at the Department of State.

b. From in or around December 1982 until in or around January 1985, the Defendant served as a Political Officer at the United States Embassy in Santo Domingo, Dominican Republic.

c. From in or around February 1987 until in or around February 1989, the Defendant served as a Political-Military Affairs Officer at the United States Embassy in Tegucigalpa, Honduras.

d. From in or around February 1989 until in or around November 1991, the Defendant served as the First Secretary at the United States Embassy in Mexico City, Mexico.

e. From in or around November 1991 until in or around July 1994, the Defendant served as the Deputy Chief of Mission at the United States Embassy in Santo Domingo, Dominican Republic.

f. From in or around July 1994 until in or around July 1995, the Defendant served as the director of Inter-American Affairs on the United States National Security Council, with special responsibility for, among other things, Cuba.

g. From in or around July 1995 until in or around July 1997, the Defendant served as Deputy Principal Officer at the United States Interests Section in Havana, Cuba.

h. From in or around July 1997 until in or around November 1999, the Defendant served as Deputy Chief of Mission at the United States Embassy in Buenos Aires, Argentina.

i. From in or around July 2000 until in or around August 2002, the Defendant served as Ambassador to Bolivia at the United States Embassy in La Paz, Bolivia.

**The Defendant's Conduct to Gain Access to Nonpublic Information**

Throughout the Defendant's Department of State employment, the Defendant had unique access to nonpublic United States government information and made efforts to gain access to such information. Specifically, the Defendant repeatedly was required, in questionnaires, security briefings, interviews, and other settings, to affirm that he understood and would adhere to laws and regulations restricting the use and sharing of nonpublic government information, including classified information, which was subject to greater restrictions, as detailed below:

3

a. On November 25, 1981, the Defendant signed a Security Agreement in which he acknowledged he could not publish or reveal to any person, either during or after his State Department employment, any classified or administratively controlled information, or any other information transmitted to him in confidence in the course of his official duties; and

b. On January 12, 1989, the Defendant signed a Classified Information Nondisclosure Agreement, in which he acknowledged that unauthorized disclosure of nonpublic government information could cause irreparable injury to the United States or could be used to advantage a foreign nation.

Throughout the Defendant's State Department career, the Defendant also was required to affirm his loyalties to the United States and confirm he did not conduct any covert activity on behalf of any foreign nation. The Defendant repeatedly answered these questions falsely, as detailed below:

c. On May 1, 1981, the Defendant completed a Form SF-86 "Security Investigation Data for Sensitive Position" and submitted it to the Department of State, in which the Defendant falsely responded "no" to the questions "Are you now or have you ever been an agent or representative of, or otherwise employed by or acted for a foreign principal, either personally or through association with a firm?" and "Are you now or have you ever been a member of any foreign or domestic organization, association, movement, group, or combination of persons which is totalitarian, fascist, communist, or subversive?"

d. On September 22, 1991, the Defendant falsely stated in an SF-86 Questionnaire for National Security Positions that he had not ever "been employed by or acted as a consultant for a foreign government, firm or agency."

e. On May 8, 1994, during an FBI background investigation interview conducted at the United States Embassy in Santo Domingo, Dominican Republic, regarding his appointment to the United States National Security Council, the Defendant falsely stated, among other things, that he did not know of any situation, past or present, which could have a bearing on his suitability for employment with the United States government; that there was nothing in his personal life that may negatively affect his appointment to the National Security Council or that could be used against him; and that he had no foreign contact with Cuban nationals.

f. On August 25, 1999, in an SF-86 Questionnaire for National Security Positions, the Defendant falsely answered "no" to the following questions, among others: (a) "Are you now or have you ever been employed by or acted as a consultant for a foreign government, firm, or agency?"; (b) "Have you ever had any contact with a foreign government, its establishments (embassies or consulates), or its representatives, whether inside or outside the U.S. other than on official U.S. Government business?"; (c) "Is there anything in your personal life that could be used by someone to coerce or blackmail you?; and (d) "Is there anything in your life that could cause an embarrassment to you or to the President if publicly known?"

### The Defendant's Contacts in 2022 and 2023 with an Undercover Representative of the Republic of Cuba

On November 15, 2022, while in Miami, the Defendant responded to a WhatsApp message from an individual purporting to be a covert DGI representative, but who was, in fact, an FBI undercover employee ("UC"). The message read: "Good Afternoon ambassador, my name is Miguel and I have a message for you from your friends in Havana. It is in regards to a sensitive matter. Are you available for a telephone call?" The Defendant replied: "I don't understand but you can call me."

Later that day, the Defendant participated in a recorded phone call with the UC, in which the UC informed the Defendant his name was "Miguel" and that he was "representing your friends in Havana." The UC further informed the Defendant that he was "ordered . . . to make contact with you to give you a message. I know that you have been a great friend of ours since your time in Chile." Independent evidence, to include travel records, confirm that the Defendant lived in Chile in or around 1973, which is when the Defendant agreed to become an agent of the Republic of Cuba. The UC then explained "we have little problems in the island and in our embassy in Santo Domingo as well, but don't worry, I'm here to resolve the situation, but these are very delicate issues, and it would be best to talk about it in person." The Defendant agreed to meet the UC in person the following day in front of a church on 6th Street in the Brickell neighborhood of Miami at 10:00 am.

### The First UC Meeting: November 16, 2022

On November 16, 2022, as directed, the Defendant met the UC in front of the First Miami Presbyterian Church at approximately 10:00 am. This meeting was audio and video-recorded, as were the Defendant's two subsequent meetings with the UC.

6

While traveling to the meeting location, the Defendant engaged in a Surveillance Detection Route ("SDR") consistent with prior training the Defendant received from the DGI. The purpose of an SDR is to determine whether the individual is being followed or observed on the way to a covert meeting. Specifically, the Defendant took an indirect, longer, circuitous route to the church, rather than going there in a direct manner. In addition, among other things, the Defendant stopped during the route at a location for several minutes so that he could observe the meeting place from a safe distance. Indeed, he later told the UC that "they are not going to see me when I come out over here … that's what I did today because I did a whole route . . . It's what I've always been told to do."

At the start of his meeting with the UC, the Defendant guided the UC to a "food court" at their location with "low-level employees . . . who don't want to spend too much money. So, there's no possibility for - for anyone to see me." The Defendant referred to this as a "measure . . . out of precaution" because "I have always . . . received sufficient training to know that you must be on the alert to - to provocations."

When the UC told the Defendant he was "a covert representative here in Miami" whose mission was "to contact you, introduce myself as your new contact, and establish a new communication plan," the Defendant answered "Yes," and proceeded to engage in a lengthy conversation with the UC, during which the Defendant repeatedly described and celebrated his activity as a Cuban agent.

During this meeting, the Defendant told the UC: "I want you to tell my Compañeros that I appreciate, and I am very thankful for this alert," explaining that during his last contact with the DGI, "I was able to travel . . . to the capital and while there I had a long meeting . . . [i]n Havana." The Defendant added, regarding the UC's explicit reference to "Havana" during their initial

7

conversations: "we have another name. We never utilize Havana . . . I tend to say 'The Island.' . . . I never use C or H . . . [T]hat was the only thing that . . . I thought, if someone has betrayed and told the enemy's counterintelligence . . . why are they utilizing . . . Havana . . . But . . . Miguel is what I remembered, because I don't write anything down . . . I try to memorize things . . . for security reasons."

The Defendant said that "since the Dirección asked me . . . to lead a normal life . . . I have - have created the legend of a right-wing person." The Defendant's use of a legend, which is a clandestine agent's artificial background or a feature of his biography used to maintain his covert status, was at the direction of the Republic of Cuba.

The Defendant said this meeting was "my first contact - . . . since my - my last trip to [] Havana," which the Defendant stated was in "2016 or 2017," when he traveled to Havana via Panama and "[f]rom Panama, I went to . . . I mean, I entered as - as a Dominican," referring to his use of his Dominican Republic passport instead of his American passport. Independent travel records confirmed that in January 2017, the Defendant travelled to Cuba exactly as he described to the UC. Specifically, on January 2, 2017, using a United States passport, the Defendant flew from Miami International Airport in Miami, Florida to Santo Domingo, Dominican Republic. On January 3, 2017, using his Dominican Republic passport instead of a U.S. passport, the Defendant flew from Santo Domingo to Panama City, Panama and then from Panama City to Havana, Cuba. On January 7, 2017, using his Dominican passport, the Defendant flew back from Havana to Panama City, and then to Santo Domingo. The Defendant subsequently flew back to Miami on January 8, 2017, using his United States passport.

The Defendant further explained that "I always told myself, 'The only thing that can put everything we have done in danger is - is . . . someone's betrayal, someone who may have met me, someone who may have known something at some point.'"

The Defendant assured the UC that "my number one concern; my number one priority was the . . . any action on the part of Washington that would – would endanger the life of – of the leadership, or the – or the revolution itself."

The Defendant asked the UC to send "my warmest regards to the Dirección," and after the UC promised to do so, the Defendant said the following:

| | |
|---|---|
| Defendant: | [I]t was decades - it was decades. I mean, decades that were deep - |
| UC: | How many years? |
| Defendant: | Almost 40. |
| UC: | Wow. |
| Defendant: | Uh – of a lot of danger. Uh . . . They must have told you something because you mentioned Chile. . . . That . . . inspired trust in me and at the same time I thought, if there's a traitor and they know that I was in Chile[.] . . . I have to tell you something. |
| UC: | Tell me. |
| Defendant: | Uh . . . It gives me a lot of . . . pride and satisfaction to see that – that people like Miguel, who are – who are much younger, but – |
| UC: | Thank you. |
| Defendant: | - who are there – |
| UC: | Thank you. |
| Defendant: | – doing . . . This is not easy – |
| UC: | No, no, it is not easy. No, it is a struggle – |
| Defendant: | – it is not easy – |
| UC: | – but we are fighting. |
| Defendant: | – this is not easy. Uh. . . uh. . . |
| UC: | Thank you for your friendship and help for so many years. Right? Thank you very much. |
| Defendant: | Of course, no problem … This is a huge sacrifice . . . huge, with a lot of tension that you have to manage internally . . . |

9

> uh . . . with self-discipline - . . . all the time. . . . When you have the conviction, you have self-discipline –

The Defendant agreed to meet the UC again on February 10, 2023, with February 17, 2023, as a backup date. The Defendant also proposed a backup location if the pair could not meet in Miami. The Defendant described a specific location in Santo Domingo, Dominican Republic, where "low-income people . . . go to the food court" so that the Defendant would not be identified.

### The Second UC Meeting: February 17, 2023

On February 17, 2023, the backup date agreed upon at the first meeting, the Defendant met the UC as planned at the Brickell outdoor food court where they had met previously.

When traveling to the meeting, the Defendant again used an SDR, or counter-surveillance techniques similar to those for the first meeting, and consistent with the Defendant's training by the DGI. Additionally, upon meeting the UC, he utilized a Colombian Pesos bill as a parole, and complimented the UC on his cover story for their meeting. The Defendant told the UC, regarding their meeting location: "I have my bank here . . . So, it's my legend for being here."

The Defendant assured the UC "But of course" when told the DGI wanted to confirm "that you continue to be a Compañero of ours."

The Defendant said, regarding how he obtained his State Department employment: "I went little by little . . . It was a very meticulous process . . . very disciplined – but very disciplined. . . . I knew exactly how to do it and obviously the Dirección accompanied me. . . . they knew that I knew how to do it . . . It's a long process and it wasn't easy."

When asked by the UC "if there was an opportunity, where we can work together again," the Defendant replied: "No – no . . . you guys don't even have to propose that . . . if I had access to something that was worthwhile, I – I would propose it [points at himself]. Uh . . . and the access . . . it's having access to information that's important."

During their meeting, the Defendant celebrated his activities on behalf of the DGI and against the United States' interests, and explained why and how he continued to preserve the secrecy of those activities, stating among other things: (1) "[F]or me, what has been done, has strengthened the Revolution.  It has strengthened it immensely . . . [W]e can't put - put that in danger . . . I'm very zealous in regards to what we have done and with what I have to protect, and what we have done."; (2) "I have to protect what we did because what we did . . . because what we did is . . . the cement that has strengthened the last 40 years.  I mean, that cement is concrete.  It's not [UI], it's concrete.  You know?"; (3) "I wouldn't put what we have done in danger . . . because . . . they would react strongly against the Revolution . . . strongly because of the fact that through my participation we – we did what we did."; (4) "They underestimated what we could do to them.  We did more than they thought"; and (5) "the Dirección knows" what the Defendant did.

During this meeting, the Defendant further said, as confirmed in the screenshot below from close-captioned video of the meeting: "What we have done . . . it's enormous . . . More than a grand slam."  During their meeting, the Defendant also lamented "the blows that the enemy," meaning the United States, "has dealt to the current revolution."

The Defendant agreed to meet the UC a third time, and made arrangements for that meeting including a backup plan, reassuring the UC that "you can ask the Dirección . . . I was always there."

### The Third UC Meeting:  June 23, 2023

On June 23, 2023, the Defendant met the UC in person at the outdoor food court where they had met the previous two times.  When traveling to the meeting, the Defendant again used an SDR, consistent with the training the Defendant had received from the DGI.

During their meeting, when told by the UC that "the Dirección wants to ensure that you are still a Compañero of ours . . . Are you still with us?," the Defendant responded later: "I am

11

angry. I'm pissed off . . . Because of the question that was asked . . . It's that – that . . . it's like questioning my manhood . . . It's like you want me to drop them . . . and show you if I still have testicles." Later, when told that with "the help that you have given us for so long . . . you must have a great pair of balls not to be worried," the Defendant replied: "I have them - I have them."

The Defendant promised the UC that, if there were an investigation, he knew "how to handle it," and assured the UC: "I know how to defend myself . . . I have the intelligence . . . and I have the knowledge. I mean . . . in the course of my duties, how many times did I meet with - with them . . . to answer questions . . . I know how it works the – the system."

The Defendant stated to the UC that "I never – never have in 40 years put a Compañero in danger. Or others, never. And there are certain rules . . . from this type of work that, be it us, be them, be the Russians . . . So then, whoever is in a mission doesn't see the other one in another. That is simply a no, because it jeopardizes everything."

The Defendant promised the UC that "I protect – I protect everything that has been done. I have always protected it and will protect it and I know how to protect it."

The Defendant made arrangements to meet the UC a fourth time on December 8, 2023, also selecting backup dates.

Throughout all three meetings with the UC, the Defendant behaved as a Cuban agent. The Defendant consistently referred to the United States as "the enemy," and used the term "we" to describe himself and Cuba. The Defendant additionally praised Fidel Castro as the "Comandante," and referred to his contacts in Cuban intelligence as his "Compañeros" (comrades) and to the Cuban intelligence services as the "Dirección." The Defendant also made other statements during the meetings that independent evidence confirmed to be true.

**Diplomatic Security Service Interview on December 1, 2023**

On December 1, 2023, two Department of State Diplomatic Security Service ("DSS") agents conducted a consensual, voluntary interview of the Defendant. During the DSS interview, the Defendant lied repeatedly. For example, the Defendant denied ever having met someone with the UC's description, even after being shown a picture of the UC. When the Defendant was shown a picture of him sitting across from the UC during one of their meetings, the Defendant said the UC approached him, but one time only. When told the interviewers possessed information that he met with the UC on more than one occasion, the Defendant stated he did not want to comment.

Based upon the foregoing facts, which establish all the elements of the charges to which the Defendant is pleading guilty, the Government would prove the Defendant's guilt at trial.

MARKENZY LAPOINTE
UNITED STATES ATTORNEY

Date: 4/12/24   By: _____
JONATHAN D. STRATTON
ASSISTANT UNITED STATES ATTORNEY

Date: 4/12/24   By: _____
JOHN C. SHIPLEY
AUSA, SENIOR COUNSEL

Date: 4/12/24   By: _____
JACQUELINE M. ARANGO
ATTORNEY FOR DEFENDANT

Date: 4/12/24   By: _____
VICTOR MANUEL ROCHA
DEFENDANT

Date: 4/12/24          By: _____
                            HEATHER M. SCHMIDT
                            SENIOR TRIAL ATTORNEY
                            NATIONAL SECURITY DIVISION


Date: 4/12/24          By: _____
                            CHRISTINE A. BONOMO
                            TRIAL ATTORNEY
                            NATIONAL SECURITY DIVISION